**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

WESLEY CARUTHERS,

        Plaintiff,

v.                                                          Case No. 3:17-cv-40-J-32PDB

CORIZON HEALTH SERVICE, INC.,
et al.,

        Defendants.

## ORDER

**I.** *Status*

Plaintiff, an inmate of the Florida penal system, is proceeding on an Amended Complaint (Doc. 12), as supplemented (Doc. 51), against Corizon, a former medical provider for the Florida Department of Corrections; Trek McCullough, the Director of Nursing for Corizon; Christina Mandeville, LPN; Shayla Moore, LPN; Jeremy Moore, LPN; Marcia[1] Taylor, LPN; and Donna Washington, LPN.[2] Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs between January 2015 and May 2015 at Columbia Correctional Institution - Annex.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 73), with exhibits (Docs. 72, 74). Plaintiff has responded (Doc. 79). The Court permitted the

---

[1] Plaintiff spells this Defendant's first name Marsha, but the Court will use the spelling provided by Defendants.

[2] Plaintiff also named the Secretary of the FDOC, Lisa Tomlinson, and Mrs. Williams, but the claims against these three Defendants have been dismissed. See Orders (Docs. 14, 65).

filing of Defendants' Reply (Doc. 82) and Plaintiff's Sur-Reply (Doc. 83). The Motion is ripe for review.

## II. *Plaintiff's Amended Complaint*

Before entering the FDOC, Plaintiff was partially paralyzed, confined to a wheelchair, and was suffering from several long-term medical issues. He has a neurogenic bladder condition which causes him to have muscle contractions and spasms, and requires him to use a "supera pubic catheter;" he also has "daily sciatic nerve pain" and "decubitis [u]lcers" from being in a wheelchair. To accommodate these issues, Dr. Marceus provided Plaintiff with medical passes for supplies to clean and dress the area around the catheter, Ibuprofen 600mg for pain, Oxybutynin for bladder spasms, and a donut cushion for hemorrhoids.

On January 27, 2015, Plaintiff was in medical for his biweekly catheter changing, and he "complained of very severe pain in the bladder area, heavy discharge of reddish/yellow pus[] around the open incision that was very irritated[,] and [he] reported the open and very heavily leaking discharge (dec[u]bitus [u]lcer, pressure sore) on left buttocks near the rectum area, and the chronic prostate severely swollen." A nurse took a urine sample and wound culture, and Plaintiff was advised that he would receive the results in about 1 week. About 10 days later, Plaintiff sent a sick-call request to medical requesting the results, but he did not receive a response despite the fact that the lab report showing multiple infections had been received 3 days after the culture and sample were taken.

On February 12, 2015, "Plaintiff reported to medical in severe pain due [to] the U.T.I. and the complications of the decubitis [u]lcer getting worse, leaking through clothes." Defendant S. Moore helped Plaintiff gather the necessary items to change his catheter. Plaintiff advised her of "the complications and severe pain he was suffering" and requested that she access the results of his recent tests. She refused to do so because she was "very busy" and only working part-time. She also "did not/or would not refer Plaintiff to the doctor."

The next day (February 13, 2015), Plaintiff reported to medical to receive his weekly supplies for his catheter, but he "was denied these items by medical staff, and was told to report on Monday because no[]one []was available[] to distribute these supplies." According to Plaintiff, "this is a repeated issue on not getting supplies in a timely manner," which leaves him "subjected to dangerous bacteria that causes these infections" because his wounds are left uncovered.

On about February 16, 2015, "Plaintiff was placed in solitary confinement" and all of his keep-on-person medications and bandage supplies were taken. The next day (February 17, 2015), he notified Sergeant Carter,[3] who "[i]mmediately took Plaintiff" to medical to see Defendant J. Moore. Despite Plaintiff explaining his issues and need for medications and dressing supplies, Defendant J. Moore "refused to give Plaintiff any substitute meds or any dressing supplies," and he told Plaintiff that "he was going home in a couple of hours and worked part time," "he was not reviewing any files for

---

[3] Plaintiff spells this individual's surname Carter and Charter in the Amended Complaint.

the lab results[,] and was not giving Plaintiff any supplies[.]" He then "threw his pen on the desk, and told Sgt. Carter to take the Plaintiff back to his cell and told [Plaintiff] to sign up for sick-call, but stated he didn't have any sick-call forms."

Two days later, February 19, 2015, Plaintiff told Defendant Washington and another nurse that he needed his pain medication and dressing supplies for the "open leaking wound and open incision for the catheter [s]ite," and he also "needed to be seen by the doctor for possible M.R.S.A. Staph infection and follow-up on the lab result, taken on Jan. 27th, 2015." Plaintiff provided both nurses with handwritten sick-call requests (not on the sick-call form because no forms were available), but both nurses refused to help him.

The next day, February 20, 2015, Defendant Mandeville provided Plaintiff with his hemorrhoid cream and lactulose. Plaintiff advised her that he needed his pain and bladder spasm medications and dressing supplies, but she responded that she did not have any medication or supplies and did not have time to review his medical file. When Plaintiff told her that he had been denied dressing supplies for more than a week and a half, she told him to sign up for sick-call but she did not have any sick-call forms.

Plaintiff submitted another sick-call request on February 23, 2015, and he submitted a grievance on February 28, 2015. On March 1, 2015, Plaintiff showed Defendant J. Moore his supply pass and advised him that he needed pain medication and dressing supplies "for open wounds that were leaking heavy discharge," but Moore responded that he was busy and refused to provide any assistance. Then, on March 2, 2015, Plaintiff asked Defendant Mandeville for pain medication and dressing supplies

4

for his "open incision catheter [s]ite, and [to] cover the pressure sore that . . . was leaking heavily everywhere," but "she refused." According to Plaintiff, at this point in time, he had gone 17 days without pain medication and over 25 days without dressing supplies and a donut cushion. He notes that no sick-call announcement was made in the confinement wing on March 4, 2015, which is "common practice."

On March 5, 2015, Plaintiff was seen by a nurse who renewed his pain medication and bladder spasm medication, and she had Dr. Marceus prescribe antibiotics for the infection. His catheter was changed, and he was provided with 3 days' worth of supplies to clean and bandage his open wounds and 2 days' worth of Ibuprofen, but no bladder spasm medication because it was not available. Plaintiff does not believe that his antibiotics were fully administered.

On March 9, 2015, Defendant Mandeville refused to provide Plaintiff with any pain medication. On March 11, 2015, Plaintiff requested pain medication, and Defendant Mandeville provided him with Oxybutynin (bladder spasm medication) but denied him any pain medication. The next day, March 12, 2015, Defendant Mandeville refused to review Plaintiff's medical chart and again denied him pain medication.

On March 13, 2015, Defendant Taylor provided Plaintiff with gauze pads only, and she said she would return with the correct supplies, but she did not. Plaintiff was left to use "soiled rags to clean wounds and [had] no protective cover for the incision [s]ite." Plaintiff advised Sergeant Stone on March 14, 2015, that he needed to be seen by medical. However, Sergeant Stone advised that "'he called medical twice, apparently they [were] not coming." Plaintiff submitted another sick-call request on

March 15, 2015, "putting nurse on notice and requesting Ibuprofen (10 days since doctor wrote order)."

Due to his severe pain and distress, Plaintiff declared a medical emergency on March 16, 2015. He was seen by a nurse and Dr. Marceus. Dr. Marceus ordered additional testing. On March 17, 2015, Defendant Washington or another individual "took control of the cultures from Plaintiff's cell for processing," but "to the best of Plaintiff's knowledge and belief these specimens were never followed up on, or monitored by Corizon." Also on March 17, 2015, Defendant Mandeville provided Plaintiff with a prescription for Ibuprofen that had been written on March 12, 2015. According to Plaintiff, he had gone 31 days without pain medication.

Defendants Mandeville and Taylor provided Plaintiff with an array of dressing supplies on March 20, 2015. The supplies, however, were not correct, and Defendants "refused to gather the right supplies, and took back what they brought." They advised Plaintiff that they should have gone home already and they were not making any more trips to medical. Sergeant Carter was present and told Plaintiff, "'[They're] trying to kill you.'"

On March 23, 2015, Plaintiff asked Defendant Mandeville for a sick-call form and explained that he did not have his weekly supplies, but she responded that she did not have any sick-call forms or supplies to give him. "Plaintiff was left another week to clean with a soiled rag and to cover the wound the best he would to keep fluids from spreading everywhere." One week later, on March 30, 2015, Plaintiff was released from solitary confinement. On April 1, 2015, he was seen by medical

concerning a UTI and open wound cultures that were taken on March 16, 2015. However, the cultures were not processed properly which resulted in additional delay. On April 3, 2015, additional cultures were taken by Defendant Washington, but not properly processed.

Plaintiff reported to medical on April 10, 2015, to follow up on the lab results. The "nurse searched the computer for lab results to no avail, due to improper processing." On April 13, 2015, "Plaintiff reported to psychology call out" and he declared a medical emergency "due to the severe pain and suffering and emotional stress from a prolonged delay in . . . timely treatment for the U.T.I. [and] open wounds." A nurse "proceeded to explain to Plaintiff that the 'sensitivities' were not being analyzed by the lab because [the] . . . nurses sending specimens were not following proper procedure for analysis."

On April 14, 2015, a nurse advised Plaintiff that he was positive for a urine infection (staph), but the antibiotic would take one week to arrive. On April 17, 2015, Plaintiff saw Dr. Marceus, explained all of his concerns, and requested a referral to a urologist. Dr. Marceus said, "'Corizon will not allow him to refer [Plaintiff] to an outside doctor, they are trying to cut costs.'" On May 6, 2015, Plaintiff met with Defendant McCullough about not receiving adequate treatment. Defendant McCullough advised that Corizon "'would not approve an outside consult to a urologist or gastrologist due to budget restrictions.'"

"As a combined accumulation of Corizon . . . and the incompetency of the nursing staff, Plaintiff has a[nd] continues to suffer needlessly which are completely

7

intentional failures after the chief medical doctor has ordered treatment to be carried out." As relief in this case, he seeks declaratory relief and monetary damages.

## III.  *Governing Legal Principles*

### A. Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); see Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of

8

production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

### B. Deliberate Indifference to Serious Medical Needs

"To prevail on [a] § 1983 claim for inadequate medical treatment, [the plaintiff] must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and [the plaintiff's] injury." Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 (11th Cir. 2017) (citation omitted).

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (quotations and citation omitted).

Deliberate indifference to a serious medical need requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th

9

Cir. 2003) (citations omitted); see Dang, 871 F.3d at 1280; Melton v. Abston, 841 F.3d 1207, 1223 & n.2 (11th Cir. 2016). "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Dang, 871 F.3d at 1280 (quoting Caldwell v. Warden, FCI Talladega, 784 F.3d 1090, 1099-1100 (11th Cir. 2014)).

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe Cty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997), overruled on other grounds by LeFrere v. Quezada, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. See Harris v. Coweta Cty., 21 F.3d 388, 393-94 (11th Cir. 1994) (citing Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).[4] Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

---

[4] "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted). However, "[i]t is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985)); see Boone v. Gaxiola, 665 F. App'x 772, 774 (11th Cir. 2016).

Dang, 871 F.3d at 1280. "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" Id. (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)).

## IV.    *Parties' Positions*

Defendants argue that the record shows "nothing more than single incidents of negligence by several nurses." According to Defendants, Plaintiff's claims that he was denied Oxybutynin, cleaning supplies, and treatment for a decubitus ulcer "are no longer pertinent, as Oxybutynin was not ordered by the physician during the relevant period; nurses were not responsible for cleaning supplies, but each time they were made aware of the need, he was provided with supplies; and he did not have a decubitus ulcer." So according to Defendants, only Plaintiff's complaints about not receiving pain medication (Ibuprofen) are "pertinent." As to Corizon, Defendants argue that "[Plaintiff] does not allege a Corizon custom or policy caused him constitutional injury. He also does not allege a widespread unconstitutional practice by a policymaker. The record supports neither. At most, he premises liability vicariously."

Defendant McCullough submitted the following affidavit:

> In 2015, I was the Director of Nursing at Columbia Correctional Institution and employed by Corizon Health, Inc. I was previously employed by the Florida Department of Corrections, and I am now a regional quality assurance nurse for Centurion of Florida, which currently provides medical care to FDOC inmates.
>
> I reviewed pertinent medical records from Mr. Caruthers' file. He complains nursing staff failed to provide him with medications, particularly Ibuprofen, 600 m.g. and

11

> Oxybutynin and various antibiotics. During my employment by FDOC, Corizon, and now, Centurion, and particularly with reference to Mr. Caruthers, these medications were identified as "keep on person" medications ("KOP"). KOP medications are ordered by practitioners: physicians, nurse practitioners and physician assistants, and delivered to inmates through the pill window by pharmacy technicians. The medications are not delivered by nurses.
>
> Nurses play no part in this process. The medications are ordered by practitioners and delivered at the pill window. Nurses cannot order medications. When a medication order is nearing expiration, it is up to the inmate to appear at sick call with sufficient time remaining on the order for a practitioner to review the order if appropriate.

Doc. 74-1 at 1-2. Attached to Defendant McCullough's affidavit are some of Plaintiff's medical records. See id. at 4-43. Defendants also filed copies of two of Plaintiff's formal grievances and the responses thereto. Doc. 72.

Plaintiff argues that Dr. Marceus set forth a treatment plan for him, but Corizon and the six individual Defendants "interrupted" the plan and violated his rights. To support his position, he filed copies of his medical records, sick-call requests, grievances, and affidavits from himself and other inmates. Docs. 79-1 to 79-20.

V. *Discussion*

A. **Chronological Summary of Pertinent Grievance Responses**

On February 27, 2015, in response to Plaintiff's formal grievance, Dr. Marceus stated:

> The person that gathers the supplies has been spoken to and advised that your supplies were put in triage to be taken to you, they were delivered. The nurse in N-Dorm

> followed through and you told her you had all your supplies.

Doc. 72-1 at 2. On March 13, 2015, Dr. Marceus advised Plaintiff in response to another formal grievance:

> Columbia Staff bear the responsibility of determining the level and type of care received by inmates. They operate within department guidelines so that considerations and treatments are rendered based on their professional judgment. You were seen in sick call on 03/05/15. After reviewing the results from the culture that was done, the doctor ordered Rocephin injections for 7 days and Clindomycin for five days for the infections noted. If you are still having problems, sick call is always available.

Id. at 4. On March 27, 2015, Plaintiff received the following response from Dr. Marceus to a formal grievance:

> When your grievance was submitted the nurse in confinement was questioned about your care and your medical supplies. The nurse stated that all had been taken care of. **Upon further investigation it was found that the information received was not correct.** You have now been seen by the medical department and you have received antibiotics, supplies and have also been scheduled for follow up treatment. If you have any more issues concerning this please utilize your option to contact Medical by an inmate request as this will get to us faster and the ma[tt]er can be addressed more quickly.

Doc. 12-2 at 3 (emphasis added). On April 1, 2015, Dr. Marceus authored the following response:

> You were seen by medical on 3/5/15 and multiples times since. You have had medications ordered and catheter changed as well as you have been started on antibiotics[. Y]ou have also received your supplies. It is unclear as to what caused the delay in your treatment as you have claimed. However if it happens again you are urged to send an inmate request to the Administrative Assistant so this

13

> can be handled in a more timely manner. The inmate request process is a faster process.

Doc. 12-3 at 4. On April 9, 2015, Dr. Marceus responded to another formal grievance submitted by Plaintiff:

> Review of your medical records and the pharmacy [show] the IBU was refilled on 4/2/15, the dorms keep[] this in the officer station also. Medical staff has been spoken with and she . . . states that you were receiving your medication while in confinement.

Doc. 12-4 at 3. On that same date, another response was written: "You were seen by the doctor on 04/01/15. Your medications have been ordered and you are receiving treatment. Supplies, according to your supply pass, are being sent to confinement on a weekly basis, as ordered." Doc. 12-7 at 3; see also Doc. 12-9 at 3 (grievance response dated April 9, 2015, stating "All your medications were ordered on 04/01/15."). Finally, on April 26, 2015, Dr. Marceus wrote:

> According to your available medical records it was found that you were seen by the dr. and have been seen in sick call several times since this grievance was written. All the issues have been addressed with the exception of the donut cushion. They are on back order and you will be placed on call out when they arrive to pick one up.

Doc. 12-11 at 4.

**B. Chronological Summary of Pertinent Medical Records**

During the relevant time period, Plaintiff had medical passes for dressing supplies, see Doc. 12-1 at 3, and there were multiple orders written for Ibuprofen 600 mg. See Doc. 74-1 at 4 (January 2015), 13 (March 5, 2015 and April 1, 2015), 30 (April 8, 2015), 35 (April 17, 2015), 39 (May 12, 2015). He also had a one-year medical

14

pass for a donut cushion written on April 1, 2014. Doc. 12-1 at 5. Oxybutynin was also prescribed. See Doc. 79-6 at 1 (January 5, 2015);[5] Doc. 74-1 at 13 (April 1, 2015), 39 (May 12, 2015); see also id. at 22 (treatment note dated March 30, 2015, noting current medications include Oxybutynin).

Plaintiff had a wound culture and urine culture done on January 26, 2015. Doc. 74-1 at 9, 11. The wound culture report is dated January 30, 2015, and it has a handwritten date of March 11, 2015 and signature of a Corizon ARNP at Columbia Annex. Id. at 9. The urine culture report is dated January 29, 2015. Id. at 11.

On March 5, 2015, Plaintiff was at sick call to have his catheter changed and he received antibiotics. Id. at 12. He received another round of antibiotics on March 6, 2015. Id. at 18.

Plaintiff explained in a sick-call request dated March 11, 2015, that he would be out of supplies on March 12, 2015. Id. at 16. He was seen on March 16, 2015, for supplies pass renewal and cultures, and he was given an antibiotic for infection. Id. at 17. He was instructed to return in three days for his catheter to be changed. Id.

Plaintiff indicated on a sick-call request dated March 18, 2015, that security took his donut cushion on January 16, 2015 during a shakedown. Id. at 20. Plaintiff's catheter was changed on March 19, 2015. Id. at 21. On March 30, 2015, he was seen by a nurse for his complaints of hemorrhoids and pain in his prostate area. Id. at 22.

---

[5] The date on this record appears to be January 5, 2015. Oxybutynin also appears on the last line of the first order sheet on Doc. 74-1 at 4, but the date is unreadable.

On April 1, 2015, Plaintiff had blood work completed, id. at 23-25, and he was seen by Dr. Marceus, who renewed his medications. Id. at 26. On April 3, 2015, Defendant Washington collected a wound culture and stool sample from Plaintiff. Id. The report is dated April 6, 2015, and it reflects that some tests were not performed. See id. at 27-28. He was seen by a nurse on April 8, 2015, who did a full examination, addressed his complaints, and ordered medications. See id. at 29. Also on April 8, 2015, a culture was taken from Plaintiff's catheter area and from the left side of his buttocks. Id. at 33. The laboratory report is dated April 14, 2015, and on April 15, 2015, Dr. Marceus wrote "Ampicillin ordered." Id. at 31; see also id. at 33 ("Dr. Marceus reviewed lab results and ordered an additional antibiotic."), 34 (note from Dr. Marceus). On April 12, 2015, Plaintiff was seen in the chronic illness clinic by Dr. Marceus. Id. at 36. On April 14, 2015, Plaintiff was given some medication for a potential UTI, a bed bag for his catheter, and his medications were ordered. See id. at 33.

Plaintiff submitted a sick-call request on April 18, 2015. Id. at 37. On April 22, 2015, Plaintiff was seen in sick call regarding the antibiotics, but they were still waiting on the other medications. Id. at 34. On May 10, 2015, he submitted a sick-call request indicating that he had taken all of the antibiotics for his infections, but the "pressure sore is still open" and he is experiencing a lot of pain. Id. at 40. He indicated that 2 Ibuprofen per day and 1 tube of cream were not enough. Id. He requested to see a urologist and gastrologist. Id.

**C. Analysis**

Initially, the Court addresses Defendants' contention that Plaintiff's claims that he was denied Oxybutynin, cleaning supplies, and treatment for a decubitus ulcer "are no longer pertinent, as Oxybutynin was not ordered by the physician during the relevant period; nurses were not responsible for cleaning supplies, but each time they were made aware of the need, he was provided with supplies; and he did not have a decubitus ulcer." First, as noted above, Oxybutynin was prescribed during the relevant time period. See Doc. 79-6 at 1 (January 5, 2015);[6] Doc. 74-1 at 13 (April 1, 2015), 39 (May 12, 2015); see also id. at 22 (treatment note dated March 30, 2015, noting current medications include Oxybutynin). Defendants assume that the medical record clearly dated January 3, 2016, which shows Plaintiff refusing all future doses of Oxybutynin (Doc. 74-1 at 5), was misdated and that this refusal really occurred in January 2015 "given it's [sic] placement within the medical records." Doc. 73 at 4 n.2. This assumption is unfounded and unsupported by the record which shows Oxybutynin ordered for Plaintiff after January 2015.

Second, Plaintiff alleges that he did not have dressing supplies when he was first placed in confinement, and between February 17 and March 2, 2015, Defendants J. Moore, Washington, and Mandeville refused to provide him with any despite his requests. No medical records from this time period were filed, so Defendants' assertion that Plaintiff received supplies when requested is not only contrary to Plaintiff's

---

[6] The date on this record appears to be January 5, 2015. Oxybutynin also appears on the last line of the first order sheet on Doc. 74-1 at 4, but the date is unreadable.

assertions but unsupported by the current record. Additionally, Defendant McCullough's averment that nurses were not responsible for cleaning supplies does not carry the day, especially when considering the asserted severity of Plaintiff's condition. Plaintiff was requesting his prescribed supplies and medications, and the necessity for treatment, according to Plaintiff's version of the facts, was obvious.

Third, whether the wound on Plaintiff's buttocks was a decubitis ulcer, boil,[7] pressure sore, or other wound, according to Plaintiff, it was still an open wound that was leaking through his clothing. In such a circumstance, the need for treatment is obvious.

Regarding the claims against the individual Defendants, Defendants do not dispute that Plaintiff had a serious medical need, nor do they separately analyze each individual's alleged conduct. Rather, Defendants simply conclude that their actions were "nothing more than single incidents of negligence." But a failure or refusal to obtain medical treatment for an inmate may constitute more than mere negligence. See Colardo-Keen v. Rockdale Cty., Ga., 775 F. App'x 555, 568-69 (11th Cir. 2019) ("A person's conduct can amount to more than mere negligence in a few different ways. Outright 'fail[ure] or refus[al] to obtain medical treatment for the inmate' rises to the level of deliberate indifference." (quotations and citation omitted)); Dang, 871 F.3d at 1280 ("An official disregards a serious risk by more than mere negligence when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or

---

[7] See Doc. 74-1 at 8 (skin protocol completed on January 26, 2015, noting that Plaintiff had a "boil on left buttock").

refuses to obtain medical treatment for the inmate." (quotations and citation omitted)). Considering the facts in the light most favorable to Plaintiff, as the Court must, the Court finds that genuine issues of material fact exist as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs precluding entry of summary judgment as to the individual Defendants.

Finally, as to Corizon, the Court agrees with Defendants that Plaintiff has failed to show a custom, policy, or practice attributable to Corizon that violated his federal constitutional rights. Corizon cannot be held liable based on Plaintiff's version of the facts. Therefore, the Motion will granted in favor of Corizon only.

Accordingly, it is

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 73) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED to the extent** that Corizon is entitled to judgment in its favor. Judgment will be withheld pending adjudication of the case as a whole. The Motion is otherwise **DENIED**.

2. By **October 25, 2019**, the parties shall confer in good faith in an attempt to settle the remaining claims. If the parties resolve the case without further Court intervention, they shall file the appropriate documents to close out the file. If the parties are unable to settle the claims, they shall file a notice by **November 1, 2019**,

advising whether they believe a settlement conference before a United States Magistrate Judge would be beneficial.

**DONE AND ORDERED** at Jacksonville, Florida, this 23rd day of September, 2019.

*[signature: Timothy J. Corrigan]*

TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 9/23
c:
Wesley Caruthers, #366067
Counsel of Record